IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARRY R. TANGERT, JR.,  :
    Plaintiff  :
      :
    v.  :  CIVIL NO. 1:11-CV-2395
      :
MARK CROSSAN, et al.  :
    Defendants  :

*M E M O R A N D U M*

I. *Introduction*

Plaintiff, Barry R. Tangert, Jr., a former Pennsylvania State Trooper, filed this action asserting two civil-rights claims. The defendants are Jaime Keating, the first assistant district attorney for Cumberland County, Pennsylvania, and seven members of the Pennsylvania State Police (PSP): Mark Crossan, Scott Miller, William Fraley, Gilbert Morrissey, M.L. Henry, Nick Chimienti, and Kathy Jo Winterbottom, "the Commonwealth Defendants."

The first claim is against all the defendants, alleging that they harassed Plaintiff in violation of his First Amendment rights for speaking to Keating and to certain of the PSP defendants about Keating's supposed improper prosecution of two innocent persons. The second claim is against Winterbottom alone for false arrest when she initiated a criminal prosecution against Plaintiff. In that case, she charged him with an attempt to hinder Keating's prosecution of the two individuals by way of his conversations

with Keating and the PSP personnel. This prosecution is also alleged to be part of the harassing conduct in the first claim.

We are considering two motions for summary judgment under Fed. R. Civ. P. 56, one filed by Keating and the other by the Commonwealth Defendants.

II. *Standard of Review*

Under Fed. R. Civ. P. 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In deciding a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Meditz v. City of Newark,* 658 F.3d 364, 369 (3d Cir. 2011)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)).

With this standard in mind, we present the following background, sufficient for resolution of the summary-judgment motions. For the most part, we rely on the Commonwealth Defendants' statement of material facts (DSMF) and Plaintiff's counter-statement (CSMF), including admissions in the CSMF. We will sometimes borrow the parties' language without attribution.

III. *Background*

On October 5, 1992, plaintiff Tangert enlisted with the Pennsylvania State Police (PSP). (Doc. 46, DSMF ¶ 1, and CSMF ¶). "During the final six years of his employment, Tangert was Procurement and Supply Officer at Troop H. Prior to that, he was a patrol trooper." (*Id.* ¶ 5, and CSMF ¶ 5).

At some point before August 2008, Tangert had been involved in a sexual relationship with a woman named Traci Georgiadis. Ms. Georgiadis' husband was named John. (*Id.* ¶ 9, and CSMF ¶ 9). In 2007, Traci Georgiadis and Plaintiff reconnected, but only socially. (Doc. 47-7, ECF p. 3, Tangert IAD interview). She told Tangert that she and her husband were being prosecuted in Cumberland County, Pennsylvania, for involuntary deviate sexual intercourse with a person less than sixteen years old. (DSMF ¶ 10, and CSMF ¶ 10). She gave him the details, and he looked at the case file. (Doc. 47-7, ECF p. 4). "Based on his experience and training as a PSP Trooper, he perceived there were problems with the investigation, including documentation of the victim's interview." (Doc. 46, DSMF ¶ and CSMF ¶ 15). Tangert

"felt like [he] needed to look into things and that maybe [he] could present them to [his] superiors[.]" (Doc. 47-7, ECF pp. 3-4).

On August 4, 2008, Tangert contacted Keating by phone to request a meeting to discuss the Georgiadis criminal case. During this phone call, Tangert identified himself as a PSP Trooper, (*Id.*, ECF pp. 7-8), but said he was not acting in an official capacity. (*Id.* ECF p. 7). Tangert made the call from his PSP office over his lunch break and used his own cell phone. (*Id.*, ECF p. 8). Tangert identified himself as a PSP Trooper partially to give himself more credibility. (*Id.*, ECF p. 27). He also did so as a courtesy. (*Id.*, ECF p. 7).

"Tangert believed that if the Georgiadis criminal investigation had been improperly conducted, PSP had an obligation to 'look into it[.]'" (*Id.*, ECF pp. 24-26). As a Trooper, Tangert had taken "an oath to uphold the laws of the Commonwealth" and he believed "it was his duty to talk to ADA Keating." (Doc. 46, DSMF ¶ 18 and CSMF ¶ 18; Doc. 47-4, ECF p. 26, Tangert Dep.).

On August 5, 2008, Tangert met with Keating at Keating's office. Upon arrival, Tangert identified himself as a PSP Trooper. (Doc. 46, DSMF ¶ 19 and CSMF ¶ 19). He told Keating he was bending PSP rules by talking to him and that he could get in trouble. (Doc. 47-8, ECF p. 6, Tangert trial testimony; Doc. 47-7, ECF p. 15). He also acknowledged that it was out of the norm. (Doc. 47-7, ECF p. 20). Tangert provided Keating with a typewritten document outlining the deficiencies Tangert saw in the Georgiadis criminal investigation based on Tangert's review of the case file. (Doc. 46,

-4-

DSMF ¶ 22 and CSMF ¶ 22; Doc. 39-2, ECF p. 15). He sarcastically joked that he would be willing to re-interview the minor victim, although he knew that he was not an appropriate person to do so. (Doc. 47-7, ECF p. 14; Doc. 47-4, ECF p. 13).

Following the meeting, Tangert was concerned that Keating had not agreed to take additional investigatory steps in the Georgiadis criminal matter and that Keating believed the victim. (Doc. 47-7, ECF pp. 16-17). Tangert was concerned because he was "a trooper who – who you know does investigations, who's coming to [ADA Keating] with a serious issue." (Doc. 47-7, ECF p. 12). Tangert suspected improprieties in the criminal case against the Georgiadises and that ADA Keating was aware of those improprieties. (Doc. 47-7, ECF p. 10).

On August 6, 2008, Tangert phoned Keating again and told him of the sexual nature of his relationship with Traci Georgiadis. (Doc. 47-7, ECF pp. 18-19). He also told him he would do something drastic, such as going to the press, if the matter were not resolved. (Doc. 39-1, ECF pp. 25, 36, and 51). That day after work, Tangert went home and compiled a list of criminal charges he believed Keating was guilty of. (Doc. 47-7, ECF pp. 21-22). Tangert used internet sites to obtain Keating's personal information (name, address, social security number, operator's license number, date of birth, eye color and height), information specifically needed to file criminal charges. (Doc. 47-7, ECF p. 32. Tangert believed he would need that personal information to present to his supervisors because, "that's one of the initial steps [researching personal information]

that any police officer does when he believes there's a suspect of a crime." (Doc. 47-7, ECF p.33).

"Tangert described his retrieval of ADA Keating's personal information as something a "police officer" does when he believes someone to be guilty of a crime, and that the information would be needed on "any paperwork that you would officially document." (Doc. 47-8, ECF pp. 7-8). "Tangert described the situation between himself and ADA Keating as one, 'where a trooper suspected some things.'" Doc. 47-7, ECF p. 34).

On August 7, 2008, Tangert went to Corporal Nicholas Chimienti, the Crime Corporal for Troop H, and explained his concerns about ADA Keating and the charges that had been filed against the Georgiadises. Tangert chose Corporal Chimienti because "'the crime room [was] the place to go[.]'" (Doc. 47-4, ECF pp. 28-29). From August 2008 through March 2010, Corporal Chimienti was not Tangert's supervisor, and Tangert was not in Corporal Chimienti's chain of command. (Doc. 46, DSMF ¶ 36 and CSMF ¶ 36). "Tangert said PSP was the appropriate agency to look into ADA Keating's alleged crimes, because 'we're law enforcement officers; we have an obligation to objectively look at this situation.'" (Doc. 46, DSMF ¶ 37 and CSMF ¶ 37). Tangert presented Corporal Chimienti with the same written information Tangert had presented to Keating, but had added language that could have been used in a criminal complaint outlining the crimes he believed Keating had committed. Tangert printed the document at PSP Troop

H, Harrisburg, Pennsylvania on the reverse side of PSP stationary having a PSP letterhead. (Doc. 47-7, ECF p.30; Doc. 39-2, ECF p. 46, "Tangert Amended Statement").

Corporal Chimienti took Tangert to see the Crime Sergeant (now Lieutenant) Mark Crossan to further discuss the situation. (Doc. 46, DSMF ¶ 41 and CSMF ¶ 41). "At no time from August, 2008 until March, 2010, was Lieutenant Crossan Tangert's supervisor, or in Tangert's chain of command." (Doc. 46, DSMF ¶ 42 and CSMF ¶ 42). "Tangert gave Lieutenant Crossan the impression he wanted to arrest ADA Keating." (Doc. 47-7, ECF pp. 27, 28-29).

"Later on August 7, 2008, Tangert spoke to Lieutenant (now Captain) Scott Miller at Troop H, Harrisburg, Pennsylvania. Captain Miller informed Tangert that he had violated PSP regulations by interfering in an investigation by another law enforcement agency and that he was being suspended from duty." (Doc. 46, DSMF ¶ 44 and CSMF ¶ 44). On August 7, 2008, Tangert was removed from duty by Captain William Fraley, pending the outcome of a fitness for duty review. (Doc. 47-13).

"Tangert believes PSP FR 1-1 'ties the hands of any law enforcement agent' and that 'we as law enforcement officers have an obligation to do something when we see that something wrong is occurring.'" (Doc. 46, DSMF ¶ 46 and CSMF ¶ 46).[1] "Tangert felt that PSP, by suspending him for interfering in another law enforcement

---

[1] PSP FR 1-1 (Doc. 47-12) is Field Regulation 1-1, which at §§ 1.18 and 1.19 generally prohibits a trooper from interfering with investigations or prosecutions by other agencies.

agency's investigation, had told him he "wasn't supposed to do [his] job anymore." (Doc. 46, DSMF ¶ 47 and CSMF ¶ 47).

Lieutenant Crossan later spoke to ADA Keating at Captain Miller's request to verify Tangert's actions vis-à-vis ADA Keating. Lieutenant Crossan told ADA Keating that Tangert was going to file charges against Keating. Tangert saw this phone call as "one trooper . . . run[ning] behind another trooper's back and [calling] a suspect." (Doc. 47-14, ECF pp. 3-4; Doc. 64-1. ECF p. 2).

Tangert's understanding of Pennsylvania State Police regulations and practices is that he had "an affirmative duty to report criminal wrongdoing to [his] superiors." (Doc. 47-4, ECF p. 35).

Based on a conflict of interest, the Cumberland County District Attorney referred the matter of Plaintiff's contacts with Keating to the Pennsylvania Attorney General's Office. (Doc. 39, Keating SMF ¶ 27 and CSMF ¶ 47). On December 29, 2009, by way of a criminal complaint with defendant Winterbottom as the affiant, Plaintiff was charged with five crimes: (1) threats and other improper influence in official and political matters, in violation of 18 Pa. Con. Stat. Ann. § 4702; (2) two counts of obstructing administration of law or other governmental function, in violation of 18 Pa. Con. Stat. Ann. § 5101; (3) retaliation against a prosecutor or judicial official, in violation of 18 Pa. Con. Stat. Ann. § 4953.1; and (4) criminal attempt of obstructing administration of law or other governmental function, in violation of Pa. Con. Stat. Ann. § 901. (Doc. 39, Keating SMF ¶ 28 and CSMF ¶ 28; Doc. 47-3, ECF pp. 2-5). The complaint was supported by an

affidavit of probable cause setting forth Plaintiff's contacts with Keating and certain of the Commonwealth Defendants and the defendants' recollections of the conversations that took place. (Doc. 47-3, ECF pp. 6-7).

On February 1, 2011, a jury found Plaintiff guilty of one count of obstructing administration of law or other governmental function. *Commonwealth v. Tangert*, No. CP-21-CR-1378-2010, at pp. 3 and 7 (Cumberland Cnty.); (Doc. 39, Keating SMF ¶ 30 and CSMF ¶ 30). On December 18, 2012, Tangert's appeal of his conviction was quashed by the Pennsylvania Superior Court. (Doc. 46, DSMF ¶ 7 and CSMF ¶ 7). On July 31, 2013, Tangert's Petition for Allowance of Appeal to the Pennsylvania Supreme Court was denied. (Doc. 46, DSMF ¶ 8 and CSMF ¶ 8).

On May 5, 2011, the PSP dismissed Tangert from employment. The stated reason for doing so was his criminal conviction. (Doc. 46, DSMF ¶ 3 and CSMF ¶ 3; Doc. 47-5, ECF p. 2).

IV. *Discussion*

        A. *Because Plaintiff Was Convicted, Summary Judgment Will be Entered in Favor of Defendant Keating on the First Amendment Retaliation Claim*

To establish a First Amendment retaliation claim, a plaintiff must show: (1) that he "engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory

action." *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007). When the retaliatory action is alleged to be a criminal prosecution, the plaintiff must allege and prove a lack of probable cause for the prosecution. *Hartman v. Moore*, 547 U.S. 250, 265-66, 126 S.Ct. 1695, 1707, 164 L.Ed.2d 441 (2006)(retaliatory prosecution claim requires the plaintiff to allege and prove a lack of probable cause).

Plaintiff alleges that Keating participated in a plan to bring the criminal prosecution against him to retaliate for his exercise of his First Amendment rights in discussing the Georgiadis criminal matter with Keating and with Plaintiff's superiors. (Compl. ¶ 49).[2] In moving for summary judgment, defendant Keating argues the claim is barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

In *Heck,* the Supreme Court ruled that a section 1983 claim for damages arising from a criminal conviction does not accrue "for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," until the plaintiff proves that the

---

[2] In addition to the alleged retaliation of filing the criminal case against him, Plaintiff alleges that the Commonwealth Defendants, as opposed to Keating, performed the following retaliatory actions as well:

> improperly ordered [him] to change the color of his hair, to change or alter reports that were the duty of his superiors, to cease and desist his right to file an EEO complaint with the PSP Equal Employment Opportunity Office, wrongfully accused of emotional and mental instability and subjected to evaluations and forced treatments, was subjected to unlawful restrictions limiting his freedom to move about, and associate, of complaining of his intentions to go to the newspapers, [and] was improperly and baselessly placed on limited and restricted duty . . . .

(Compl. ¶ 12).

"conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87, 114 S.Ct. at 2372 (footnote omitted).

As defendant Keating points out, *Heck* applies to retaliatory prosecution claims. *See Ashton v. City of Uniontown*, 459 F. App'x 185, 187 (3d Cir. 2012) (nonprecedential). Keating asserts that *Heck* applies here because Plaintiff has not had his conviction overturned or otherwise vacated and that if he were to succeed on his First Amendment claim, it would call into question the validity of his conviction. We agree. There is no doubt that Plaintiff stands convicted. And if we were to allow the claim to proceed, the jury would necessarily have to decide if the statements he made to defendant Keating and to certain PSP defendants were protected speech, thereby impugning the validity of his conviction. *Id.* at 188, 189.

This claims also fails for another reason. On a First Amendment retaliatory prosecution claim, the plaintiff must prove a lack of probable cause. *Hartman, supra,* 547 U.S. at 265-66, 126 S.Ct. at 1707. Plaintiff's conviction establishes there was probable cause. His claim against Keating thus fails on this element of the claim. *See Walker v. Clearfield Cnty. District Attorney*, 413 F. App'x 481, 483 (3d Cir. 2011) (nonprecedential)(on a retaliatory prosecution claim, the plaintiff's plea of guilty defeated any later assertion that his prosecution was without probable cause, an essential element of the claim); *Chizmar v. Borough of Trafford*, 454 F. App'x 100, 104 (3d Cir.

2011)(nonprecedential)(finding of guilt by a Pennsylvania magisterial district judge defeated probable-cause element of a retaliatory prosecution claim). *See also Kossler v. Crisanti*, 564 F.3d 181, 188 (3d Cir. 2009)(on a malicious prosecution claim, the underlying criminal judgment must show "the plaintiff's innocence of the alleged misconduct underlying the offenses charged").

Finally, we agree with Keating that Plaintiff has no claim because he admits that his contacts with Keating and the PSP personnel were part of his duties. "To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). In part, "[a] public employee's statement is protected activity when . . . in making it, the employee spoke as a citizen . . ." *Id.* at 241 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006)). However, a public employee does not speak as a citizen when he makes a statement "pursuant to [his] official duties . . . ." *Garcetti,* 547 U.S. at 421, 126 S.Ct. at 1960.

Here, Keating admits that as a Trooper, he had taken "an oath to uphold the laws of the Commonwealth" and he believed "it was his duty to talk to ADA Keating" concerning the Georgiadis criminal case. He also stated that "we as law enforcement officers have an obligation to do something when we see that something wrong is occurring," and he felt that PSP, by suspending him for interfering in another law enforcement agency's investigation, had told him he "wasn't supposed to do [his] job

-12-

anymore." In the face of these factual admissions, *see Anderson v. CIR*, 698 F.3d 160, 167 (3d Cir. 2012), we conclude that Plaintiff's comments to Keating and to PSP personnel were part of his official duties.[3] Hence, under *Garcetti* Plaintiff has no First Amendment retaliation claim.[4]

Defendant Keating was only implicated in that part of the retaliation claim based on retaliatory prosecution, so our decision means he is entitled to summary judgment against Plaintiff.

> B. *The Commonwealth Defendants' Motion for Summary Judgment*
>
> 1. *Defendant Winterbottom Is Entitled to Summary Judgment on the False Arrest Claim in Count II*

In Count II, Plaintiff makes a "false arrest" claim against Winterbottom for a "vindictive and selective prosecution" which was allegedly pursued simply because Plaintiff "suggested to his superiors" that they evaluate whether to charge Keating. (Compl. ¶¶ 51 and 19).

---

[3] "[W]hether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007). Plaintiff's factual admissions allow us to conclude that his actions were part of his official duties. *See Eaton v. Siemens*, No. 07-CV-315, 2009 WL 4929262, at *16 (E.D. Cal. Dec. 14, 2009)(*Garcetti* bars retaliation claim when the plaintiff admits his speech was part of his job duties as a police officer); *Abato v. New York City Off-Track Betting Corp.*, No. 03-CV-5849, 2007 WL 1659197, at *7 (S.D.N.Y. Jun. 7, 2007)(*Garcetti* bars retaliation claim when the plaintiff admits his speech was part of his job duties).

[4] Plaintiff argues *Garcetti* does not apply because he told Keating during their first phone conversation he was not acting in an official capacity. We disagree. A public employee cannot avoid *Garcetti* by announcing in a particular case that he is not acting pursuant to his official duties, when he recognizes at the same time that his actions are part of his duties.

In moving for summary judgment, the Commonwealth Defendants first argue that the count fails to state a claim for false arrest because Plaintiff was convicted of obstructing administration of law or other governmental function and that therefore he cannot show a lack of probable cause, an essential element of the claim. We agree. *See Shelley v. Wilson*, 339 F. App'x 136, 139 (3d Cir. 2009)(nonprecedential)(on a false arrest claim a conviction defeats an assertion there was a lack of probable cause).

Defendants next argue that *Heck, supra*, bars the claim since Plaintiff has not had his conviction reversed on appeal or otherwise invalidated. We agree with this argument as well. *See Wallace v. Kato*, 549 U.S. 384, 393-94, 127 S.Ct. 1091, 1098, 166 L.Ed.2d 973 (2007)(*Heck* will require dismissal of a false arrest claim if the plaintiff is ultimately convicted).[5]

### 2. *The Commonwealth Defendants Are Entitled to Summary Judgment on Count I, the First Amendment Retaliation Claim*

In moving for summary judgment on the First Amendment retaliation claim, the Commonwealth Defendants, in part, argue the claim fails under *Garcetti, supra*, because Plaintiff was performing his official duties when he discussed the Georgiadis case with Keating and certain PSP officers. In support, they point to Plaintiff's admissions that he was acting according to duty.

---

[5] If the claim was meant to be one for retaliatory prosecution, Plaintiff's failure to show a lack of probable cause would defeat that claim as well. *Hartman, supra*, 547 U.S. at 265-66, 126 S.Ct. at 1707.

We already discussed this argument in connection with Keating's motion for summary judgment. Based on our analysis there, we agree with the defendants that *Garcetti* bars Plaintiff's retaliation claim.

We discuss briefly Plaintiff's hair-color claim. Plaintiff alleged in his complaint that he was forced to change his hair color in retaliation for having discussed the Georgiadis case with Keating and certain PSP officers. In his brief in opposition to the defendants' summary judgment motion, he argues the order to change his hair color was gender discrimination.

We need not resolve the factual issues surrounding the hair-color claim. Plaintiff did not make a gender discrimination claim in his complaint, only that he was ordered to change his hair color based on retaliation, a claim we have already rejected. We need not address a new claim raised for the first time in a brief. *See Taylor v. Sanders*, ___, F. Appp'x ___, ___, 2013 WL 4010249, at *3 (3d Cir. 2013) (nonprecedential)("'At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).'")(quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

We will therefore enter summary judgment in favor of the Commonwealth Defendants on the First Amendment retaliation claim. We will issue an appropriate order.

       /s/ William W. Caldwell
William W. Caldwell
United States District Judge

Date: January 7, 2014